**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OLIVIA PESCATORE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 08-2245 (RMC) |
| | ) |
| JUVENAL OVIDIO RICARDO | ) |
| PALMERA PINEDA, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION**

Members of the family of the late Frank Thomas Pescatore, Jr., bring suit against Juvenal Ovidio Ricardo Palmera Pineda ("Palmera Pineda") and  Fuerza Armadas Revolucionarias de Columbia ("FARC"), under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333 *et seq*.  The ATA authorizes civil suits in U.S. federal court against terrorists, identified as such by the United States Department of State, for harm caused by acts of international terrorism against American citizens. Mr. Pescatore, an American geologist working in Colombia in 1996, was kidnaped, held for ransom, and murdered by the Caribbean bloc of FARC, which was led at the time by Defendant Palmera Pineda.  Before the Court is Plaintiffs' Motion for Default Judgment [Dkt. # 14], to which Defendants Palmera Pineda and FARC  have failed to respond.  Finding that Defendants have properly been served, and that personal and subject matter jurisdiction exist for this action, the Court will grant default judgment against the Defendants in part and deny it in part.

## I. FACTS

### A. Defendants FARC and Palmera Pineda

Defendant FARC "is an armed and violent organization in the Republic of Colombia," tracing its origins back to the 1960s. Compl. [Dkt. # 1] ¶ 14. At that time, FARC was established to "control the autonomous Communist-controlled rural areas of Colombia . . . [becoming] one of Latin America's oldest, largest, and most ruthless Marxist oriented organizations." *Id*. ¶ 17. Due to its violent insurgency activities, "the CIA openly classified FARC as a terrorist supporting organization in a report titled 'International Terrorism in 1979.'" *Id*. ¶ 18. In 1987, the Department of State publicly "listed FARC as a terrorist organization in a report titled 'Patterns of Global Terrorism: 1987.'" *Id*. ¶ 19. In that report, it "noted that FARC was 'anti-US' and engaged in 'armed attacks against Colombian targets, bombing of US businesses, kidnappings of Colombians and foreigners for ransom, and assassinations.'" *Id*. ¶ 19 (quoting "Patterns of Global Terrorism: 1987"). FARC has remained on the list of terrorist organizations ever since. *Id*. ¶ 19. In 1997, the Secretary of State designated FARC as a Foreign Terrorist Organization pursuant to 8 U.S.C. § 1189. *Id*. ¶ 20.

"The governing structure of FARC includes a body known as the Secretariat, which is a ruling council of FARC." *Id*. ¶ 21. "The seven highest ranking members of FARC comprise the Secretariat . . . [which] make policy and ideological decisions for the organization." *Id*. ¶ 21. "FARC's strategic decisions are made by a group of individuals known as the Estado Mayor Central or the Central High Command . . . [including] the most senior commanders of FARC, i.e. the Bloc Commanders, Mini-Bloc Commanders and Mobile Column Commanders." *Id*. ¶ 22. "[T]he Estado Mayor Central have consistently endorsed the use of kidnappings and murder to influence the policy

and affect the conduct of the government of the Republic of Colombia and the United States." *Id*. ¶ 23.

"FARC is organized along military lines to implement its strategic goals." *Id*. ¶ 24. "FARC fronts control certain areas of Colombia, and these fronts are organized into different blocs that consist of five or more fronts." *Id*. ¶ 24. There are seven FARC blocs throughout Colombia: Eastern Bloc, Western Bloc, Southern Bloc, Central Bloc, Middle Magdalena Bloc, Northwestern Bloc, and Carribean Bloc. *Id*. ¶¶ 24-25.

"Defendant Palmera Pineda joined the FARC in 1987 and was thereafter promoted to various high level positions as a member of FARC's Caribbean Bloc fronts." *Id*. ¶ 26. Defendant Palmera Pineda assumed a senior ranking position as part of the General Staff of the Carribean Bloc in November 1996 . . . [thereby serving] on the Estado Mayor Central." *Id*. ¶ 27.

**B. December 1996**

In December 1996, Mr. Pescatore was working as a geologist for the Cerrejon coal complex in La Guajira Department, Colombia. *Id*. ¶ 28. "On or about December 10, 1996, members of the FARC's Caribbean bloc under the command and control of defendant Palmera Pineda attacked the coal complex." *Id*. ¶ 29. Though no Colombians were injured, the FARC attempted to capture Americans, and succeeded in capturing Mr. Pescatore. *Id*. ¶ 29. "According to the Colombian Departmento Administrativo de Seguridad (Administrative Security Department-the equivalent of Colombia's FBI), 'the kidnapping had been ordered by the leadership of the Carribean Bloc, . . . the rebel Ricardo Palmera [Pineda], alias Simon Trinidad.'" *Id*. ¶ 30.

Ransom demands were made and Defendant Palmera Pineda was reputed to have been responsible for setting the amount of ransom. *Id*. ¶ 31. Mr. Pescatore attempted to escape and

was shot to death.  *Id*. ¶ 32.  To ensure ransom demands were still viable, the terrorists instructed a doctor to make Mr. Pescatore appear alive for "proof of life" photos.  *Id*. ¶ 33.  A doctor proceeded to gut Mr. Pescatore, fill his empty body with formaldehyde and limes, and apply make-up, with the hope that a ransom was still possible; two months later, FARC dumped Mr. Pescatore's body.  *Id*. ¶¶ 34-35.

This kidnapping and murder was documented in the Department of State's "Patterns in Global Terrorism: 1997," which stated, "Frank Pescatore, a US geologist and mining consultant, was kidnapped by the FARC in December 1996 and later killed by his captors; his body was discovered 23 February 1997." *Id*. ¶ 36.

### C. 2004: Defendant Palmera Pineda's Capture and Extradition

In 2004, Defendant Palmera Pineda was arrested in Quito, Ecuador, extradited to Colombia, and subsequently, on December 31, 2004, extradited to the United States.  *Id*. ¶ 38. According to the Department of State, he is the highest-ranking FARC leader ever captured.  *Id*. ¶ 39.  Defendant Palmera Pineda was charged and convicted for the hostage taking of several other Americans pursuant to 18 U.S.C. § 1203, and was sentenced to sixty years in prison.  *Id*. ¶ 40.  He is currently serving his term at the United States Penitentiary Administrative Maximum Facility in Florence, Colorado.

### D. 2008: Current Litigation

Plaintiffs brought suit on December 30, 2008, within four years of Defendant Palmera Pineda's extradition.  *See id*. at p. 10.  Defendant Palmera Pineda was served with a Summons and Complaint for both himself, as an individual defendant, and for FARC, as an officer for that organization on April 20, 2009.  *See* Return of Service/Affidavit [Dkt. # 4].  After an Order to Show

Cause [Dkt. # 5], Plaintiffs sought a Clerk's entry of default on March 1, 2010, *see* Affidavit for Default [Dkt. # 8], whereupon the Clerk entered default as to both Defendants.  *See* Clerk's Entry of Default [Dkt. ## 9, 10].    After another Order to Show Cause [Dkt. # 11], Plaintiffs moved for entry of default judgment on August 30, 2010.  *See* Motion for Default Judgment [Dkt. # 14].  Along with their motion, Mr. Pescatore's wife, Olivia Pescatore, three of his children, Jada, Jarrod, and Jordan Pescatore, and his sister, Carol Pescatore Harpster, filed affidavits attesting to the pain, suffering, and problems they have encountered as a result of Mr. Pescatore's kidnapping and murder. *Id*., Attachments 2; 4-7.  On October 5, 2010, the Court held a hearing in which it inquired into issues of venue, jurisdiction, and service upon Defendants.  At that hearing, Plaintiffs' attorney averred that he had spoken with Defendant Palmera Pineda's attorney, who practices law in the District of Columbia, about the lawsuit and was informed that Defendant Palmera Pineda discussed the lawsuit with his attorney and told his attorney that he was going to "blow it off."  Hearing Tr. 5:1–5; 9: 19-20, October 6, 2010.

## II. LEGAL STANDARDS

Rule 55 sets forth a two-step process for a party seeking default judgment: entry of default, followed by entry of default judgment.  Fed. R. Civ. P. 55; *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986); *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981); *see also* 10A Fed. Prac. & Proc. Civ. 3d § 2682 (stating that "[p]rior to obtaining a default judgment under either Rule 55(b)(1) or Rule 55(b)(2), there must be an entry of default as provided by Rule 55(a)").  First, after a defendant has failed to plead or otherwise defend against an action, the plaintiff may request that the clerk of the court enter default against that defendant.  Fed. R. Civ. P. 55(a).  Second, following

the clerk's entry of default, and where the plaintiff's claim is not for a sum certain, the plaintiff may apply to the court for entry of default judgment. *Id.* 55(b)(2). By providing for a two-step process, Rule 55 allows the defendant the opportunity to move the court to set aside the default before the court enters default judgment. Fed. R. Civ. P. 55(b), (c); *see also Meehan,* 652 F.2d at 276 (noting that "pursuant to Rule 55(c), the defendant has an opportunity to seek to have the default set aside").

However, "when judgment is sought against parties who have failed to plead or otherwise defend, a district court has an affirmative duty to assure itself that it has jurisdiction over both the subject matter and the parties." *Estates of Yaron Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 247 (D.R.I. 2004) (citations omitted).

## III. ANALYSIS

### A. Subject Matter Jurisdiction

Because federal courts are courts of limited jurisdiction, Plaintiffs bear the burden of proving subject matter jurisdiction. Plaintiffs have brought suit under the ATA, which provides a federal cause of action for:

> [a]ny national of the United States injured in his or his person, property, or business by reason of an act of international terrorism, or his or her estate, survivor, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). Furthermore, "the district courts shall have exclusive jurisdiction over an action brought under this chapter." 18 U.S.C. § 2338. "International terrorism" is defined as

> activities that – involve violent acts or acts dangerous to human life
> that are a violation of the criminal laws of the United States or of any

State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; appear to be intended to intimidate or coerce a civilian population; influence the policy of a government by intimidation or coercion; or to affect the conduct of a government by mass destruction, assassination or kidnapping; and occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331.  Coupled with the Department of State's report that FARC is "fueled by revenues from kidnapping, extortion, and ties to narco-traffickers,"[1] and its clear demarcation of FARC as an international terrorist organization,[2] it is abundantly clear that the acts alleged within Plaintiffs' Complaint – the kidnapping, attempted ransom, and eventual murder of Mr. Pescatore – constitute international terrorism, as defined by the ATA.  It is equally clear that Plaintiffs, as family members and "heirs," have standing to sue for those terrorist actions, seeking the remedy set forth within the statute.  Subject matter jurisdiction, therefore, exists.

### B. Personal Jurisdiction

"Before a court may exercise personal jurisdiction over a defendant, the procedural requirement of proper service of summons must be satisfied to assure notice to the defendant." *Estate of Klieman v Palestinian Auth.*, 467 F. Supp. 2d 107, 112 (D.D.C. 2006) (citing *Omni Capital Int'l v. Rudolph Wolff & Co.*, 484 U.S. 97, 104 (1987)).  In addition to proper service, "[t]here must also be a constitutionally sufficient relationship between the defendant and the forum, and a basis

---

[1] U.S. Department of State, *Patterns of Global Terrorism: 1987*, Latin American Overview (available at https://www.state.gov/www/global/terrorism/1997Report/latin.html) (last accessed October 27, 2010).

[2] *See* Compl. ¶¶ 18-10.

for the defendant's amenability to service of summons." *Id*. at 112 (citing *Mwani v. Bin Laden*, 417 F.3d 1, 8 (D.C. Cir. 2005)).  In essence, Plaintiffs must make a *prima facie* showing that Defendants (1) had minimum contacts with the United States as a whole; and (2) were served in any district where it is found, or has an agent.  *See Estates of Yaron Ungar*, 304 F. Supp. 2d at 250 (analyzing requirements under 18 U.S.C. § 2334 for personal jurisdiction over Hamas).

### 1. Proper Service

Under Federal Rule of Civil Procedure 4(k)(1)(c), "[s]erving a  summons . . . establishes personal jurisdiction over a defendant . . . when authorized by a federal statute."  Fed. R. Civ. P. 4(k)(1)(c).  The ATA contains a specific provision regarding jurisdiction and venue, which states that "[p]rocess in such a civil action may be served in any district where the defendant resides, is found, or has an agent."  18 U.S.C. § 2334(a).  Defendant Palmera Pineda was served at the United States Penitentiary Administrative Maximum Facility in Florence, Colorado, where he is incarcerated.  Given the express authorization of 18 U.S.C. § 2334, service was proper as to Defendant Palmera Pineda where he was found.

Service was similarly proper on FARC.  Under Federal Rule of Civil Procedure 4(k)(2), "serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if (1) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (2) exercising jurisdiction is consistent with the United State Constitution and laws."  Fed. R. Civ. P. 4(k)(2).  Again, "[p]rocess [under the ATA] may be served in any district where the defendant resides, is found, *or has an agent*."  18 U.S.C. § 2334(a) (emphasis added).  This express authorization of service under the ATA permits service upon a defendant wherever a defendant has an "agent."  FARC can fairly be characterized as an unincorporated association,

defined as "a body of persons acting together and using certain methods for prosecuting a special

purpose or common enterprise." *See Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 485 (1st Cir. 1985)

(citing Black's Law Dictionary 111 (5th ed. 1979)); *see also Estates of Yaron Ungar*, 304 F. Supp.

2d at 258 (finding Hamas to be an unincorporated association).   An unincorporated association is

served by "delivering a copy of the summons and of the complaint to an officer, a managing or

general agent . . . ." Fed. R. Civ. P. 4(h)(1)(B).  Plaintiffs accomplished this by "delivering a copy

of their complaint to [Defendant Palmera] Pineda who, according to the U.S. State Department,

Pineda's own admissions, and the FARC's official website, is a senior representative of the FARC."

Pl's' Mot. for Default Judgment [Dkt. # 14] at 6.[3]  Because Defendant Palmera Pineda is an agent

for FARC, service on FARC through its agent was proper.

## 2. Minimum Contacts with the United States

The second requirement, beyond proof of service, is proof of minimum contacts with

the United States.   Minimum contacts exist between Defendants and the United States by virtue of

"[t]he defendants' decision to purposefully direct their terror at the United States, and the fact that

---

[3] Plaintiffs cite (1) "*Country Reports on Terrorism 2004* at 77 ("Palmera [Pineda] is the most senior FARC leader to face US drug and terrorism charges") (available at http://www.state.gov/documents/organization/45313.pdf) (last accessed November 2, 2010); (2) *USA v. Juvenal Ovidio Ricardo Palmera Pineda*, 04-cr-232-RCL, [Dkt. # 347] (D.D.C. Nov. 30, 2007), Defendant's Sentencing Mem. at 3-4 (admitting Pineda is a senior FARC representative); (3) *USA v. Ramirez*, 07-cr-248-RCL ((D.D.C. Aug. 12, 2008); Affidavit of FBI Agent Lazaro E. Andino in Support of Request for Extradition at 10-12; *see* Mot. for Default J. [Dkt. # 14], Ex. 2 (quoting a statement from the FARC's website that Pineda is a represenative of the FARC).  *See id.*, n.10.

Furthermore, Defendant Palmera Pineda was served as an officer of FARC in a prior criminal case. *See United States v. Fuerzas Armadas Revolucionarias de Colombia*, 04-cr-232-01 (TFH), [Dkt. # 17] ("Application for Service of Summons on Defendant FARC") (D.D.C. Jul. 18, 2005); *see also id.*, [Dkt. # 18] ("Order Granting Service of Summons of FARC") (D.D.C. Jul. 19, 2005).

the plaintiffs' injuries arose out of one of those terrorist activities . . . [which] should suffice to cause the defendants to 'reasonably anticipate being haled into' an American court."   *Mwani*, 417 F.3d at 14 (citing *World-wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)).   Defendants targeted American citizens, sought ransom on them, and killed them, including Mr. Pescatore.   As noted in *Morris v. Khadr*, "because injury in the United States undeniably is a foreseeable effect of a terrorist attack purposefully directed at this country's citizens, terrorism inherently is the sort of 'conduct and connection with' the United States that should cause a foreign terrorist to 'reasonably anticipate being haled into court' here." 415 F. Supp. 2d 1323, 1336 (D. Utah 2006) (citing *World-wide Volkswagen Corp.*, 444 U.S. at 295); *see also Wultz v. Islamic Republic of Iran*, 2010 U.S. Dist. LEXIS 111469, No. 08-cv-1460 (RCL), [Dkt. # 83] (D.D.C. Oct. 20, 2010) at *53 ("[*A*]*ny* party subject to a civil claim under § 2333 may be hauled into *any* U.S. District Court, per the provision of nationwide service of process.").   Due to the purposeful targeting of Americans by terrorism, Defendants have minimum contacts here to establish personal jurisdiction.[4]

### C. Liability and Damages

Because the Court has both subject matter and personal jurisdiction, it may proceed to default judgment.   And because "Plaintiffs' Complaint adequately pleads the elements of liability

---

[4] Venue is also discussed at 18 U.S.C. § 2334: "[a]ny civil action under section 2333 of this title against any person may be instituted in the district court . . . for any district where any plaintiff resides or where any defendant resides or is served, or has an agent." Plaintiffs argue that venue within this Court is appropriate because Defendant has an agent in Washington D.C., his criminal defense attorney, with whom Plaintiffs' counsel has spoken about this lawsuit.  The Court relies instead, on waiver of venue because it cannot be said, on this record, that Defendant Palmera Pineda's lawyer is also a FARC agent.  Venue can be waived in the absence of objection. *Wultz*, 2010 U.S. Dist. LEXIS 111469, No. 08-cv-01460 (RCL) at *38 (citing Fed. R. Civ. P. 12(h)(1)).  Because Defendants have not appeared, and thus not objected to venue, any objection is waived.

under [18 U.S.C. § 2333, Defendants'] default relieves [P]laintiffs of proving these elements." *See Estates of Yaron Ungar*, 304 F. Supp. 2d at 260.   The Court must now assess damages.   Mr. Pescatore's family, jointly and severally, seek (1) compensatory damages, including for solatium, in the following amounts: Olivia Pescatore (wife of Mr. Pescatore)–$15 million, Josh Pescatore (son)–$10 million, Jada Pescatore (daughter)–$10 million, Jarrod Pescatore (son)–$10 million, Jordan Pescatore (daughter)–$10 million, Frank Pescatore, Sr. (father)–$10 million, Carol Pescatore Harpster (sister)–$5 million, Richard Pescatore (brother)–$5 million, and John Pescatore (brother)–$5 million; (2) treble damages, pursuant to 18 U.S.C. § 2333(a); and (3) any costs and fees sustained in the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a). All damages, save attorneys' fees, when trebled, total $240,000,000.

While a court may conduct a hearing on damages, it "is not required to do so . . . 'as long as it ensure[s] that there [is] a basis for the damages specified in the default judgment.'" *Carpenters Labor-Management Pension Fund v. Freeman-Carder LLC*, 498 F. Supp 2d 237, 240 (D.D.C. 2007) (citing *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997)).   "The court may appropriately consider affidavit testimony as evidence in support of plaintiffs' claimed damages." *Morris*, 415 F. Supp. 2d at 1336 (citing *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 224 (S.D.N.Y. 2003) (permitting affidavit testimony to establish damages in a Foreign Sovereign Immunities Act case); *see also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003).

"Compensatory damages awards to family members of the victim of a terrorist attack

11

are generally determined by the nature of the relationship. Spouses typically receive greater damage awards than parents, who, in turn, receive greater awards than siblings." *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 161 (D.D.C. 2006). Furthermore, "[p]arents of victims typically receive awards similar in amount to those awarded to children of the victim." *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 51 (D.D.C. 2007). "The awards in cases similar to the one at bar provide the Court with some guidance as to the appropriate amount to award to a decedent's relatives for a death caused by terrorist acts." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 111 (D.D.C. 2000). In assessing damage awards, "families of hostage or captivity victims are also typically awarded greater damages than are the families of victims of a single attack . . . [and] families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006).

Plaintiffs have failed to prove to the Court, through the affidavits and cases cited, that there is "a basis for the damages specified in the default judgment." *Carpenters Labor-Management Pension Fund*, 498 F. Supp. 2d at 240 (citation omitted). While liability has been proven, and damages will be awarded as a result of that liability, the basis for the amounts requested is not readily apparent from the evidence provided. First, only Olivia Pescatore and her children Jada, Jarrod and Jordan have submitted affidavits addressing their pain and suffering, as has Carol Pescatore Harpster, the decedent's sister. No evidence supports a damages claim for Josh Pescatore, Frank Pescatore, Richard Pescatore or John Pescatore and no damages can be awarded to them. Second, analogous cases by which to measure damages usually have the benefit of an evidentiary hearing in which to

12

assess the consequences of a terrorist act.[5]  The Court is charged with determining an appropriate amount for damages, which requires an understanding of the harm brought upon each individual Plaintiff by this terrorist act and the extent of that harm, including economic, emotional, psychological, and physical harm.  Such is entirely lacking for Josh, Frank, Richard and John Pescatore.

Olivia Pescatore, wife of Mr. Pescatore, seeks $15 million for herself, three children of Mr. Pescatore seek $10 million each, and Ms. Harpster seeks $5 million in compensatory damages.  These figures are not connected to any loss of earnings from Mr. Pescatore or any economic damages of any kind.  The Complaint merely prays for "compensatory damages, including for solatium [for Olivia Pescatore], in amounts not less than . . . ."  Compl. [Dkt. # 1] at 9 (Prayer for Relief).  Based upon the evidence submitted, the requested amounts for damages are not adequately established.

---

[5] *See e.g., Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003); *Estates of Yaron Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 247 (D.R.I. 2004); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97 (D.D.C. 2000); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) (utilizing special masters to determine damages); *but see Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006) (accepting affidavits solely); *Rubin v. HAMAS--Islamic Resistance Movement*, Civ. Case No. 02-0975 (RMU), 2004 U.S. Dist. LEXIS 20883 *9 (D.D.C. Sept. 27, 2004) (relying upon affidavits because "extensive evidence" . . . and "detailed findings of fact regarding the plaintiffs' damages" were already determined in *Campuzano*, 281 F. Supp. 2d at 274-79); *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 59 (D.D.C. 2006) (forgoing evidentiary hearing and relying on (1) findings made by Court in prior case arising from same incident; (2) affidavit testimony by an expert witness; (3) documentary evidence; and (4) affidavit and deposition testimony).

## IV. CONCLUSION

Accordingly, Plaintiffs' Motion for Entry of Default Judgment [Dkt. #14] will be

**GRANTED** in part and **DENIED** in part.  Plaintiffs have established liability on the part of the

Defendants, but have not adequately proven the damages requested.  The Court will order a hearing

to assess damages in this case.   A memorializing Order accompanies this Memorandum Opinion.


Date: November 4, 2010                                      _____/s/_____

ROSEMARY M. COLLYER

United States District Judge