## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| OLIVIA PESCATORE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:08-cv-02245-RMC |
| | ) | |
| JUVENAL OVIDIO RICARDO | ) | |
| PALMERA PINEDA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT REGARDING DAMAGES

Pursuant to this Court's Order on April 3, 2018 and Fed. R. Civ. 55(b), Plaintiffs hereby move for an award of damages against Defendants (1) Juvenal Ovidio Ricardo Palmera Pineda (a/k/a Simón Trinidad) ("Pineda"), and (2) Fuerzas Armadas Revolucionarias de Colombia (a/k/a Revolutionary Armed Forces of Colombia) ("FARC").  Plaintiffs' claims were brought under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), which authorizes lawsuits against terrorists. This Court previously granted default judgments against the Defendants but withheld ruling on the amount of damages until Plaintiffs submitted additional evidence. *See* Order (Nov. 4, 2010) [Dkt. #17].  Plaintiffs subsequently litigated a related case against Chiquita Brands International, Inc. based on allegations the company provided material support to the FARC.  *See In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284 (S.D. Fla. 2018).   As a result of this related litigation, Plaintiffs obtained expert reports, deposition transcripts, affidavits/declarations, and relevant documents concerning their damages that they now submit for this Court's consideration.  Plaintiffs also address the relevant legal issues concerning their damages below.

Plaintiffs' claims against the FARC and Pineda are based on the Defendants' involvement in the kidnapping and murder of Frank Thomas Pescatore Jr. ("Mr. Pescatore"). As the U.S. Department of State concluded in an annual terrorism report: "Frank Pescatore, a US geologist and mining consultant, was kidnapped by the FARC in December 1996 and later killed by his captors; his body was discovered 23 February 1997." [1] Pineda was later arrested in 2004 and found to have been a senior FARC commander.[2]   This Court may rely on these and similar U.S. government factual findings when determining Plaintiffs' damages. *See Owens v. Republic of Sudan*, 864 F.3d 751, 792 (D.C. Cir. 2017) ("The State Department's *Patterns of Global Terrorism* reports fit squarely within the public records exception.").  Moreover, by failing to respond to Plaintiffs' complaint, the "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint." *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) citing *Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 63 (2d Cir.1971), *rev'd on other grounds,* 409 U.S. 363 (1973).[3]

Plaintiffs are the family members of Mr. Pescatore. They include: (1) the Estate of Frank Pescatore, Sr. (Mr. Pescatore's father), (2) Carol Pescatore Harpster (sister and executrix for her father's estate), (3) Richard Pescatore (brother), (4) John Pescatore (brother), (5) Oliva Pescatore

---

[1] U.S. Department of State, *Patterns of Global Terrorism: 1997*, Latin American Overview (available at https://1997-2001.state.gov/global/terrorism/1997Report/latin.html) (last accessed April 23, 2018).

[2] U.S. Department of State, *International Narcotics Control Strategy Report: 2005*, South America (available at https://www.state.gov/j/inl/rls/nrcrpt/2005/vol1/html/42363.htm) (last accessed April 23, 2018) ("On January 2, 2004, Juvenal Ovidio Ricardo Palmera, alias 'Simon Trinidad,' commander of the FARC Caribbean Front and a member of the FARC senior command, was captured in Ecuador and deported to Colombia. Simon Trinidad, the most senior FARC commander ever captured, was extradited to the United States on December 31st.").

[3] This motion has not been served on the Defendants because Fed. R. Civ. P. 5(a)(2) states: "No service is required on a party who is in default for failing to appear."

(Mr. Pescatore's widow), (6) Josh Pescatore (oldest son), (7) Jada Pescatore (oldest daughter), (8) Jarrod Pescatore (youngest son), and (9) Jordan Pescatore (youngest daughter).   As detailed below, each of these Plaintiffs were severally impacted by Mr. Pescatore's kidnapping and murder and each deserve substantial compensation based on the Defendants' conduct. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 31 (D.D.C. 1998) ("When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time.").

## Background on Frank Pescatore, Jr.

Mr. Pescatore grew-up in a close-knit Italian-American family in New Jersey.[4]  He was born in 1956 to Frank Thomas Pescatore, Sr. and Carolyn Pescatore.[5] He had four siblings Carol, Richard, John, and Jane.[6]  Mr. Pescatore remained close to his family including his parents and siblings throughout his life, and he would often visit for the holidays and family reunions at his parents' house.[7] Mr. Pescatore attended high school in Caldwell, New Jersey.[8] Afterwards, he attended Lafayette College in Easton, Pennsylvania where he majored in geology.[9] He subsequently decided to pursue graduate studies in geology at the University of Southern

---

[4] *See* Ex. 1, First Declaration of Carol Pescatore Harpster (Aug. 16, 2012) at ¶ 1; Ex. 2, Second Declaration of Carol Pescatore Harpster (Feb. 25, 2017) at ¶ 9.

[5] Ex. 2, 2nd Decl. of Carol Pescatore Harpster at ¶¶ 4-5, 9.

[6] *Id.* at ¶¶ 4-11; (Jane died in 2005 and is not a party to this lawsuit, Ex. 1 at ¶ 3 n.1.)

[7] Ex. 1, 1st Decl. of Carol Pescatore Harpster at ¶ 1.

[8] Ex. 3, Declaration of Olivia Pescatore (Dec. 23, 2015) at ¶ 3.

[9] *Id.* at ¶¶ 3-4.

Mississippi in Hattiesburg.[10] It was there that he met his wife Olivia,[11] and they eventually married and moved to Louisiana so Mr. Pescatore could pursue opportunities in the state's energy sector.[12] In Louisiana they raised four children together, Josh, Jada, Jarrod, and Jordan,[13] before they relocated to Birmingham, Alabama so Mr. Pescatore could work on additional energy related projects.[14]

One of these projects included coalbed methane exploration,[15] and Mr. Pescatore joined an Alabama based company known as GeoMet, Inc. that developed coalbed methane projects around the world, including China, Switzerland, Israel, and Colombia.[16] Mr. Pescatore was working on the company's coalbed project in Colombia when he was kidnapped by the FARC on December 10, 1996.[17] The U.S State Department classified FARC as a Colombian terrorist organization and noted the organization has been "anti-US since its inception."[18] It also noted

---

[10] *Id.* at ¶¶ 2, 4.

[11] *Id.* at ¶ 5.

[12] *Id.* at ¶ 6.

[13] *Id.*

[14] *Id.* at ¶ 6-7.

[15] Ex. 4, Jeff Smith Dep. 7:16-8:16 (May 24, 2016).

[16] *Id.* at 14:2-6, 16:10-15.

[17] Ex. 3, Olivia Pescatore Decl. at ¶ 10; Ex. 5, Olivia Pescatore Dep. 143:1-19.

[18] *See* 62 Fed. Reg. 52650 (Oct. 8, 1997) (designating FARC as a Foreign Terrorist Organization); U.S. Department of State, *Patterns of Global Terrorism: 1997*, Appendix B Background Information on Terrorist Groups (available at https://1997-2001.state.gov/global/terrorism/1997Report/backg.html) (last accessed April 23, 2018).

FARC "traffics in drugs and has well-documented ties to narcotraffickers."[19] Although Mr. Pescatore was aware of security risks in Colombia, GeoMet had been informed by its Colombian investor "that this was generally a safe area of Colombia, where there was not a lot of guerrilla activity, and that was mainly due to coca not being cultivated nearby."[20]

Shortly before Christmas, Mr. Pescatore's kidnappers sent a ransom demand letter that included a handwritten proof-of-life letter that Mr. Pescatore addressed to his children.[21]  It was the last meaningful communication his children ever received from him.[22] On February 23, 1997, Mr. Pescatore was found shot to death in Colombia.[23]

When Mr. Pescatore's family learned he had been murdered, they were emotionally devastated.[24]  Mr. Pescatore's body was returned back to the United States where a massive funeral was held in Birmingham, Alabama.[25] Mr. Pescatore's family was told that the FBI would

---

[19] *Id.*

[20] Ex. 4, Jeff Smith Dep. 24:15-19.  Even if Mr. Pescatore was aware of safety risks in the area, this would not constitute a legally sufficient defense or justify reducing the applicable damages. *See, e.g.*, *Vargas v. Correa*, 416 F. Supp. 266, 269 (S.D.N.Y. 1976) ("The doctrine of assumption of the risk is applicable as a defense to an action based upon negligence, but has no place in the case of an intentional tort. In the case of an intentional tort, the inquiry is framed in terms of consent . . . .  [and] it is at best fatuous to suggest that [plaintiff] consented to being attacked by the guard."); *Hendricks v. S. Bell Tel. & Tel. Co.*, 193 Ga. App. 264, 265, 387 S.E.2d 593, 595 (1989) ("Assumption of the risk is a defense to a negligence claim, not a defense to a claim that is predicated upon an intentional tort such as battery."); *Navarre v. Ostdiek*, 518 P.2d 1362, 1363 (Colo. App. 1973) (same).

[21] Ex. 5, Olivia Pescatore Dep. 148:1-149:8; Ex. 4, Jeff Smith Dep. 37:19-39:17.

[22] Ex. 6, FARC Ransom Note and Letter from Frank Pescatore, Jr. (Dep. Ex. 90); Ex. 7, Jada Pescatore Decl. at ¶ 5

[23] Ex. 3, Olivia Pescatore Decl. at ¶ 17.

[24] Ex. 4, Jeff Smith Dep. at 57:6-23.

[25] *Id*

continue to investigate Mr. Pescatore's murder.[26] In April 2004, Olivia Pescatore was contacted by an FBI agent and informed in a letter that Pineda had been arrested and was partially responsible for Mr. Pescatore's kidnapping and murder.[27] When Olivia Pescatore and her children researched Pineda's involvement on the internet, they learned disturbing details, including that Mr. Pescatore's body had been eviscerated so that Pineda and the FARC could continue to negotiate a ransom from Mr. Pescatore's family even after they had killed him earlier during a failed escape attempt.[28]  These additional details caused further trauma to Mr. Pescatore's family.[29] For example, upon learning that her father had been gutted by the FARC while browsing the internet, Jada Pescatore needed to run to the bathroom and throw-up.[30] The FARC's evisceration of Mr. Pescatore's corpse was confirmed in an official autopsy report.[31]

---

[26] Ex. 3, Olivia Pescatore Decl. at ¶ 22.

[27] Ex. 8, Second Decl. of Olivia Pescatore at ¶5; *see also* attached FBI letter.

[28] Ex. 7, Jada Pescatore Decl., at ¶ 12; Ex. 9, Jordan Pescatore Decl., at ¶ 5; Ex. 3, Olivia Pescatore Decl., at ¶ 24. *See also* Agence France Presse—English, "*Colombian rebels disguised body of kidnapped American*" (Nov. 21, 2006) (noting "Colombian rebels applied make-up to the body of a kidnapped American they had killed, to dupe his relatives into paying ransom, the doctor who helped in the grisly scheme told El Tiempo. Arrested a week ago in Bogota, Santander Sanchez confessed to helping the kidnappers in 1997 preserve the body of US geologist Frank Thomas Pescatore for two months before it was prepped and photographed to make it appear alive."); Ex. 4, Jeff Smith Dep. at 51:3-54:15 (discussing photograph that Mr. Pescatore's company received from his kidnappers).

[29] Ex. 3, First Olivia Pescatore Decl. at ¶ 25.

[30] Ex. 7, Jada Pescatore Decl., at ¶ 12; *see, e.g.,* Human Rights Watch, "*War Without Quarter: Colombia and International Humanitarian Law*" (Oct. 1998) (last accessed April 23, 2018) (available at: https://www.hrw.org/legacy/reports98/colombia/Colom989-05.htm) (noting Mr. Pescatore's "body had been eviscerated, packed with lime and clothing, and crudely sewn up and bound with rope").

[31] Ex. 10, *Metro-Dade County Medical Examiner Department Investigation Report* (Feb. 28, 1997) at p. 1 [pdf p. 8] (noting the chest of Mr. Pescatore's corpse had been previously opened and the organs removed).

Mr. Pescatore's family also learned that it would be impossible for the U.S. government to prosecute Pineda for kidnapping and murdering Mr. Pescatore because these crimes occurred before a change in Colombian law on December 17, 1997 that allowed for the extradition of Colombian nationals.[32] As a result, even though Mr. Pescatore's family had sought to have Pineda prosecuted,[33] they discovered nothing could be done, even though Mr. Pescatore and all of the Plaintiffs were American citizens at the time of the kidnapping and murder.[34]

### Psychological Effects Suffered by Mr. Pescatore's Family

Mr. Pescatore's family seeks damages from the Defendants solely for their emotional loses. Each of the Plaintiffs were evaluated by Dr. Rael Strous, a board-certified psychiatrist and university professor with significant experience evaluating the psychological impact of terrorist attacks.[35] He made the following conclusions regarding the Plaintiffs and each Plaintiff has also submitted a declaration under penalty of perjury detailing his or her emotional damages with the exception of Frank Pescatore, Sr. who passed away in March 2016.[36] *See Blais v. Islamic*

---

[32] *See USA v. Juvenal Ovidio Ricardo Palmera Pineda,* 04-CR-232-RCL, Dkt. No. 346 (D.D.C. Nov. 30, 2007), Sentencing Mem. Ex. 1, Dept. of State, Decl. of Kenneth R. Propp at ¶ 3.

[33] *See* Asbury Park Press, "*Extradition sought in murder,*" (Jun. 13, 2004) (noting Frank Pescatore Sr. was in contact with his congressman regarding the extradition of Pineda).

[34] *See* Ex. 2, 2nd Decl. of Carol Pescatore Harpster at ¶¶ 4-11; Ex. 11, Third Declaration of Olivia Pescatore, ¶¶ 4-11.

[35] Dr. Rael Strous' biographical information is included in his expert reports and his CV is also attached to each report.

[36] On February 3, 2017, this Court authorized plaintiff Carol Pescatore Harpster to act on behalf of the Estate of Frank Pescatore, Sr.

*Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006) ("In default judgment cases, plaintiff's

may present evidence in the form of affidavits").[37]

- <u>Frank Pescatore, Sr.</u>,[38] Mr. Pescatore's father suffered from Persistent Complex

   Bereavement Disorder (also known as Pathological Grief or Complicated mourning)[39]

---

[37] Pursuant to 28 U.S.C. § 1746, declarations under penalty of perjury may also be used.

[38] After Frank Pescatore Sr. died, Dr. Strous could no longer conduct a direct evaluation of his condition; instead he performed a "psychological autopsy," which is an accepted procedure used to determine the prior mental state of a decedent. *See Bennett v. Forest Labs.*, Case No. 2:06-cv-72-FTM, 2015 U.S. Dist. LEXIS 46462, 2015 WL 1579404, at *6 (M.D. Fla. Apr. 9, 2015) (admitting psychological autopsy evidence because "the psychological autopsy . . . is . . .far from the 'junk science' that *Daubert* and Rule 702 are designed to exclude." (quoting *In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, 2009 WL 3756328, at *9 (D. Mass. Aug. 14, 2009))); *see also In re Neurontin*, 2009 WL 3756328, at *1, *6 (citing cases where psychological autopsies have been utilized); *Stupak v. Hoffman–La Roche, Inc.,* 326 F. App'x 553, 560 (11th Cir. 2009) (describing seventeen case reports of completed suicides as "inconclusive" because "nothing close to a psychological autopsy was performed on any case"); *Jackson v. State*, 553 So.2d 719, 720 (Fla. Dist. Ct. App. 1989) (admitting psychological autopsy evidence because "we perceive no distinction between the admission of the expert's opinion in this case and, for example, admitting psychiatric opinion evidence to establish a defendant's sanity at the time of committing an offense or to prove the competency of an individual at the time of executing a will"); *Harvey v. Raleigh Police Dep't*, 85 N.C.App. 540, 355 S.E.2d 147, 152 (1987) ("we note that other jurisdictions have held psychological autopsies to be admissible as competent evidence for the determination of the decedent's state of mind at his death."); *In re Estate of Hoover*, 615 N.E.2d 736, 744-45 (Ill.1993) ("We note that courts of other jurisdictions have admitted into evidence expert psychiatric testimony based on retrospective 'psychiatric autopsies' and we find no reason why Illinois courts should not do likewise."); *In re Succession of Pardue,* 915 So.2d 415, 421 (La. App. 2nd Cir. 2005) (holding expert evidence was admissible in testamentary capacity case: "since the technique employed by Dr. Ware was substantially the same as the psychological autopsy method, which is generally accepted in the psychiatric field, the trial court could reasonably have found that Dr. Ware's methodology was sufficiently reliable under the *Daubert* standard."). *See also* Federal Judicial Center, *Reference Manual on Scientific Evidence*, at 818 (3d ed. 2011) ("most experienced forensic evaluators appear to believe that conclusions regarding past mental state can often be reached with a reasonable degree of certainty if sufficient information is available").

[39] *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 97, 109-111 (D.D.C. 2015) (accepting expert findings of Larry H. Pastor, MD, FAPA, DABAM, a clinical psychiatrist at the Central Intelligence Agency's Office of Medical Services, who concluded terrorism victim plaintiffs suffered from Persistent Complex Bereavement Disorders).

and Persistent Depressive Disorder (Dysthymic Disorder), a chronic form of depression.[40]
As Dr. Strous reported, after the murder Mr. Pescatore's father "became sullen and
stopped participating in usual activities, becoming a shadow of himself, not even
attending to his beloved garden as before. His grief did not improve over the years, if
anything it only worsened. Up until he died, through his seventies and eighties, he went
downhill in terms of mood."[41]  Additionally, Carol Pescatore Harpster confirmed in her
own declaration that when her father was alive he continued to grieve and emotionally
suffer to the point that he rarely smiled or laughed before he died.[42]

- <u>Carol Pescatore Harpster</u>, Mr. Pescatore's sister suffers from Persistent Complex
  Bereavement Disorder and Post-Traumatic Stress Disorder (PTSD).[43] "She feels that after
  all these years since the kidnapping and death of her brother, the wound is still there even
  though 'boundaried' off to some extent.  This is difficult for her since she knows that the
  injury is still present."[44]  Her symptoms are expressed in several different ways.  "For
  example, her sleep remains affected. She often wakes up and thinks of Frank and what
  happened."[45] Carol Pescatore Harpster's declaration also notes that her family's
  Christmas gatherings have never been the same since her brother's murder.[46]

---

[40] Ex. 12, Expert Report of Dr. Rael Strous re: Frank Pescatore Sr. at ¶ ¶  8-10.

[41] Ex. 12, Dr. Strous Psychiatric Evaluation of Frank Pescatore Sr. at 3.

[42] Ex. 1, 1st Decl. of Carol Pescatore Harpster at ¶ 4.

[43] Ex. 13, Expert Report of Dr. Rael Strous re: Carol Pescatore Harpster at ¶8.

[44] Ex. 13, Dr. Strous Psychiatric Evaluation of Carol Pescatore Harpster at 4.

[45] *Id.*

[46] Ex. 1, 1st Decl. of Carol Pescatore Harpster at ¶ 3.

- <u>Richard Pescatore</u>, Mr. Pescatore's brother, suffers from Persistent Complex Bereavement Disorder, PTSD, and Persistent Depressive Disorder.[47]  As a result of the kidnapping and murder, his sleep was "significantly affected. He reports that these sleep problems continue to affect him and his daily drive to the extent that he has never really recovered from sleep affects—which keep him up to this day."[48] The resulting grief from his brother's murder has "had long lasting effects on him with respect to occupational functioning as well as mood, anxiety and overall life satisfaction."[49] Richard Pescatore's declaration also states that when he recalls his brother's murder he still finds himself "sobbing even after these many years."[50]

- <u>John Pescatore</u>, Mr. Pescatore's younger brother, suffers from Persistent Complex Bereavement Disorder and PTSD.[51] The "loss of his brother, to whom he was particularly close, affected many aspects of his life including martial and family relationships, social interactions and occupational function."[52] John Pesctore's declaration states he is reminded of the loss of his big brother almost every day.[53]

---

[47] Ex. 14, Expert Report of Dr. Rael Strous re: Richard Pescatore at ¶ 8.

[48] Ex. 14, Dr. Strous Psychiatric Evaluation of Richard Pescatore at 2.

[49] *Id.* at 8.

[50] Ex. 15, Declaration of Richard Pescatore at ¶ 1.

[51] Ex. 16, Expert Report of Dr. Rael Strous re: John Pescatore at ¶ 8.

[52] Ex. 16, Dr. Strous Psychiatric Evaluation of John Pescatore at 8.

[53] Ex. 17, Declaration of John Pescatore at ¶ 1.

- <u>Oliva Pescatore</u>, Mr. Pescatore's widow, suffers from Persistent Complex Bereavement Disorder, PTSD, and Persistent Depressive Disorder.[54] Mrs. Pescatore "appears to remain with intense grief, mourning her husband with an intensity that has not much abated over the years."[55] In addition, "[t]he pain and devastation that she experienced in light of the loss affected her profoundly in several areas including the need to raise her four children alone without the support of a husband. This grief has affected her social and occupational functioning to a significant extent as well as her mood and overall life satisfaction."[56] Mrs. Pescatore's declaration affirms she will forever miss her husband and best friend.[57]

- <u>Josh Pescatore</u>, Mr. Pescatore's oldest son, suffers from Persistent Complex Bereavement Disorder, PTSD, Substance Use Disorder, and Substance Induced Depressive Disorder.[58] "The loss of his father was devasting to Josh and he dealt with the loss and pain by withdrawing from his family and turning to multiple uses of substances."[59] It is likely that "his use of multiple substances is directly related to what happened to his father and his dysfunctional response to the tragedy of the loss for him. This caused considerable disturbances in a multitude of aspects of his life dramatically

---

[54] Ex. 18, Expert Report of Dr. Rael Strous re: Olivia Pescatore at ¶ 8.

[55] Ex. 18, Dr. Strous Psychiatric Evaluation of Olivia Pescatore at 9.

[56] *Id.*

[57] Ex. 3, Olivia Pescatore Decl., at ¶ 44.

[58] Ex. 19, Expert Report of Dr. Rael Strous re: Josh Pescatore at ¶ 8.

[59] Ex. 19, Dr. Strous Psychiatric Evaluation of Josh Pescatore at 11.

affecting his mood and life trajectory from which he has never recovered."[60] Josh Pescatore states in his declaration that as a result of his father's kidnapping and murder he has regular nightmares of being chased through a jungle until he is caught and eviscerated.[61]

- <u>Jada Pescatore</u>, Mr. Pescatore's oldest daughter suffers from Persistent Complex Bereavement Disorder and PTSD.[62] As a result of her father's murder, "her life direction has been affected by the lack of his presence and influence. Despite the years that have passed since his death, Jada remains deeply grieving for her father."[63] Jada Pescatore's declaration states that "[m]y family and I have lived through an absolute nightmare. The horrific events of our lives are the plots to movies. And every year we must relieve the loss of my dad during what should be the happiest family time of the year. We are robbed and tormented every Christmas."[64]

- <u>Jarrod Pescatore</u>, Mr. Pescatore's youngest son suffers from Persistent Complex Bereavement Disorder, PTSD, and Persistent Depressive Disorder.[65]  The murder of his father "took a heavy toll on him at an emotional level and dramatically affected his relationships and general mood status to a significant extent for many years. Since the loss of his father transpired at a critical stage in his adolescent development, it appears

---

[60] *Id.*

[61] Ex. 20, Declaration of Josh Pescatore, at ¶ 10.

[62] Ex. 21, Expert Report of Dr. Rael Strous Re: Jada Pescatore at ¶ 8.

[63] Ex. 21, Dr. Strous Psychiatric Evaluation of Jada Pescatore at 9.

[64] Ex. 7, Declaration of Jada Pescatore at ¶ 16.

[65] Ex. 22, Expert Report of Dr. Rael Strous Re: Jarrod Pescatore at ¶ 8.

that his interpersonal function had been affected to a significant extent."[66] This conclusion is further supported by Jarrod Pescatore's declaration in which he confirmed the deep loss of his father and the crippling heartache he experienced when he realized his father would never be around during his football and baseball games.[67]

- Jordan Pescatore, Mr. Pescatore's youngest daughter, suffers from Persistent Complex Bereavement Disorder, PTSD, and Persistent Depressive Disorder.[68] "The loss of her father, with whom she felt particularly close as a young girl, affected her in a critical manner given her age. She was affected in many ways including the need to close off, and relatively heavy use of drugs as a teenager in order to deal with her pain following the loss."[69] She has "suffered significant effects on general mood, behavior, social functioning and professional progress in light of her father's kidnapping and murder in Colombia in 1996/97."[70] As Jordan Pescatore's declaration stated, "[n]othing will ever change the fact that my family's life got turned upside down. Nothing will magically make everything ok. We live with this loss every day, some better than others, but we all miss and love my dad every minute of every day."[71]

---

[66] Ex. 22, Dr. Strous Psychiatric Evaluation of Jarrod Pescatore at 8.

[67] Ex. 23, Declaration of Jarrod Pescatore at ¶ 22.

[68] Ex. 24, Expert Report of Dr. Rael Strous Re: Jordan Pescatore at ¶ 8.

[69] Ex. 24, Dr. Strous Psychiatric Evaluation of Jordan Pescatore at 8.

[70] *Id.*

[71] Ex. 9, Declaration of Jordan Pescatore at ¶ 3.

## Anti-Terrorism Act Solatium Damages

Based on the psychiatric evaluations conducted by Dr. Strous and the Plaintiffs' declarations detailing the impact of Mr. Pescatore's kidnapping and murder on their lives, this Court has a sufficient and independent basis for determining the amount of damages to award. This is because "[t]he awards in cases similar to the one at bar provide the Court with some guidance as to the appropriate amount to award to a decedent's relatives for a death caused by terrorist acts." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 111 (D.D.C. 2000).[72] Moreover, when determining the extent of damages to award in a default judgment case, the Court "has considerable latitude in determining the amount of damages." *Jones v. Winnepesaukee Realty*, 990 F.2d 1, 4 (1st Cir. 1993) (citation omitted).   This latitude is even greater in this case because, unlike in terrorism cases brought against a defaulting state sponsor of terror, the Defendants are simply defaulting terrorists with no sovereign immunity. Thus, in determining default damages in an ATA case, this Court is not required to apply the higher standards applicable to defaults involving foreign states.  *See* 28 U.S.C. § 1608(e) (requiring claimant in a foreign sovereign immunity case to establish "his claim or right to relief by evidence satisfactory to the court").

Even so, the basic damages framework that courts have repeatedly applied in terrorism cases against foreign states is that "compensatory damages awards to family members for their pain and suffering must be determined by the nature of the relationship and the severity and duration of the pain suffered by the family member." *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006); *see also Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006). In applying this framework, "[t]hree general considerations

---

[72] The Defendants were also placed on notice regarding the specific amount of damages at stake in this case. *See* Compl. at pp. 2, 9-10.

are discernible from the case law." *Haim*, 425 F. Supp. 2d at 75. "First, spouses typically receive greater damage awards than parents, who, in turn, receive greater awards than siblings. … Second, families of hostage or captivity victims are also typically awarded greater damages than are the families of victims of a single attack. … Third, families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Id.* And a final consideration is that "[p]arents of victims typically receive awards similar in amount to those awarded to children of the victim." *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 51 (D.D.C. 2007). *See also In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570, 2012 WL 471140, at *2 n.2 (S.D.N.Y. Oct. 3, 2012) (awarding 9/11 family members damages based on the nature of each person's familial relationship to the victim).

In addition to determining the nature and extent of the family relationship harmed by a terrorist attack, the Court may also "look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium." *Estate of Heiser*, 466 F. Supp. 2d at 269. "A claim of solatium is a claim for the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). Because "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress," courts have used prior damage awards for intentional infliction of emotional distress as a basis for determining the appropriate amount of solatium damages. *Id.* at 22-23.

When the above considerations are applied here, the damages Plaintiffs seek in their complaint are fair and reasonable and comparable to the damages awarded in similar terrorism cases. For instance, in *Estate of Bayani v. Islamic Republic of Iran*, 530 F. Supp. 2d 40, 46

(D.D.C. 2007) the court awarded $30 million to the wife of an American citizen who was held captive in Iran for approximately two years before being brutally executed by the Iranian government.  Here, plaintiff Olivia Pescatore has requested $15 million in damages against the Defendants for the kidnapping and murder of her husband.  This amount is half the amount awarded to the wife of Mr. Bayani and reflects the shorter period that Mr. Pescatore was held in captivity before being murdered.  It also reflects a median between the emotional damages awarded in cases where the spouses of Americans were held captive but lived to regain their freedom and those cases where the spouses of Americans were not taken hostage but were murdered in sudden terrorist attacks before anyone was forced to anxiously endure a single night worrying about the fate of a loved one.  Because the acts of terrorism here involve both hostage taking and murder, the damages in this case should also reflect a balance between the prior awards in these two types of cases.[73]

The requested award to Olivia Pescatore is further justified because "larger awards are typically reserved for cases with aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering, such as cases involving torture or kidnapping of a

---

[73] *Cf. Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 70 (D.D.C. 1998) (wives of American hostages in Lebanon who were later freed after many months in captivity awarded $10 million each because "[t]hey endured those months in great distress, never knowing if their husbands were being tortured or were even still alive"); *Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107, 113 (D.D.C. 2000) (awarding wife of freed American hostage $10 million); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 51-52 (D.D.C. 2001) (same); *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179, 222 (D.D.C. 2003) (awarding $10 million to wives of Americans released by Iraq after being held captive for less than 50 days) *with Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 116 (D.D.C. 2005) (awarding $10 million to wife of an American killed in the 1983 bombing of the U.S. embassy in Beirut); *Dammarell v. Islamic Republic of Iran*, 281 F.Supp.2d 105, 197-98 (D.D.C. 2003) (same and citing numerous terrorism damage award cases before concluding that $10 million as solatium damages was reasonable in a bombing case); *Knox v. Palestine Liberation Organization*, 442 F. Supp. 2d 62, 79 (S.D.N.Y. 2006) (awarding shooting victim's common law wife $10 million for loss of consortium and mental anguish).

spouse." *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006).  As described in Plaintiffs' complaint at ¶ 34 and supported by Mr. Pescatore's official autopsy report,[74] the FARC not only kidnapped Olivia Pescatore's husband, they also barbarically eviscerated his body for the depraved purpose of prolonging extortion negotiations with his family.  As detailed in Olivia Pescatore's declaration at ¶¶ 24-25, she did not discover the specifics of what was done to her husband's body until after 2005 at which time she experienced additional severe emotional trauma. (Members of Pescatore's family experienced similar reactions as detailed, for example, in Jada Pescatore's declaration at ¶ 12.)

Consequently, the Defendants' conduct is so egregious that the Plaintiffs should be provided additional compensation to redress this vicious act of intentionally inflicted emotional distress. *Cf. Restatement (Second) of Torts* § 868 (1979) ("One who intentionally … mutilates … the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body").  Damages related to the intentional mutilation of Mr. Pescatore's corpse are also compensable in this case because "the deterrent purpose of the ATA is maximized if it is interpreted to subject terrorists to the broadest range of economic damages." *Knox v. Palestine Liberation Organization*, 442 F. Supp. 2d 62, 77 (S.D.N.Y. 2006).

Therefore, an award of $15 million to Olivia Pescatore is warranted as a measure of the extreme and outrageous nature of this case and the fact that the Defendants' actions lie outside the bounds of all civilized conduct.

For similar reasons, $10 million should also be awarded to each of the children of Mr. Pescatore and this amount is justified by both the nature of this case and the damages awarded in

---

[74] Ex. 10, *Metro-Dade County Medical Examiner Department Investigation Report* (Feb. 28, 1997) at p. 1 [pdf p. 8].

similar cases. *See, e.g., Higgins v. The Islamic Republic of Iran*, 2000 WL 33674311, *8 (D.D.C. Sept. 21, 2000) (awarding $12 million to the daughter of a U.S. Marine held captive and executed by Hezbollah).

Additionally, by awarding $10 million to Mr. Pescatore's children, it follows that this amount should also be awarded to his father because parents and children are generally awarded the same amounts. *See Peterson*, 515 F. Supp. 2d at 51 ("Parents of victims typically receive awards similar in amount to those awarded to the children of the victim"). Finally, an award of $5 million to Mr. Pescatore's siblings is warranted because the siblings of a terrorist attack victim generally receive half the amount awarded to parents and children,[75] and because similar amounts have been previously awarded to a victim's siblings, even though there were no comparable aggravating circumstances such as a kidnapping. *See, e.g., Elahi*, 124 F. Supp. 2d at 112 (awarding solatium damages of $5 million each to the two younger brothers of a U.S. citizen who was shot to death outside his apartment by an Iranian assassin).

Although prior decisions against state sponsors of terrorism have sometimes awarded less than the amounts Plaintiffs have requested, an award of $15 million to Mr. Pescatore's wife, $10 million each to his children and father, and $5 million each to his siblings is proper under these circumstances. The Defendants in this case were responsible for not only barbaric acts of hostage taking, murder, and mutilation that have severally traumatized Mr. Pescatore's family, but until now they have escaped all legal responsibility for their acts because Colombia's Constitution prohibits Pineda's and other FARC members' extradition to the United States for

---

[75] *See, e.g., Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000) (awarding siblings of a victim killed in a suicide bombing half the amount awarded to the victim's parents); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) (same); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 86 (D.D.C. 2006) (same); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007) (same).

crimes that occurred before December 17, 1997.[76]   Consequently, the damages awarded in this case are the best and only means of providing Mr. Pescatore's family with some semblance of justice.

### Defaulting Defendants Are Not Entitled to Any Settlement Set-Offs

Plaintiffs are entitled to the full amount of any default damages that may be awarded to them in this case without any settlement set-off adjustment from *In re Chiquita Brands Int'l Inc.*, 0:08-md-01916-KAM.  The Chiquita settlement and dismissal resolved claims by different parties that are not part of the litigation before this Court.[77]   In particular, it resolved claims that were also brought by the Estate of Frank Pescatore, Jr. as well as the estate of his deceased sister, Jane Pescatore Sparrow, whose estate filed a separate but related claim against Chiquita. Neither of these parties filed claims against Pineda or FARC. As a result, there is no way to easily apply Chiquita's settlement to the Plaintiffs in this case because the primary victim in the Chiquita case, Frank Pescatore, Jr., is not a party here.

More importantly, multiple courts have held that defaulting defendants are not entitled to set-off adjustments from a related settlement. *See State Farm Mut. Auto. Ins. Co. v. Grafman*, 968 F. Supp. 2d 480, 483 (E.D.N.Y. 2013) ("In choosing not to participate in the litigation, a defaulting party eschews the opportunity to carry this burden [to show the extent to which a recovery against it may be duplicative of the recovery from a settling defendant], and therefore does not demonstrate its entitlement to, or deserve the benefit of, a set-off."); *Hollister Inc. v. Mitchell*, 3:15-CV-1082-J-32-JRK, 2017 WL 3279166, at *4 (M.D. Fla. June 29, 2017)

---

[76] *See USA v. Pineda,* 04-CR-232-RCL, Dkt. No. 346 (D.D.C. Nov. 30, 2007), Sentencing Mem. Ex. 1, Dept. of State, Decl. of Kenneth R. Propp at ¶ 3.

[77] *See In re Chiquita Brands Int'l, Inc.*, 0:08-md-01916-KAM, Dkt. # 1803 (Fla. S.D. Feb. 15, 2018) (Stipulation of Voluntary Dismissal with Prejudice); *see also* Dkt. # 1792 (docket entry on February 5, 2018 re settlement statement).

(defaulting defendant not entitled to reduced damages because "[h]e has made no claim or request for an offset or reduced damages of any kind."); *Baker v. Trustworthy Land Title Co.*, No. 1:14-CV-01617-RLY-DML, 2015 WL 9487885, *3 (S.D. Ind. Dec. 9, 2015) (defaulting defendant had burden "to demonstrate that the one-satisfaction rule can or should apply, has not been waived, and the amount of common damages for which any set-off might be appropriate."). *See also Restatement (Third) of Torts Apportionment Liab.* § 16 cmt. f (2000) (after a jointly liable tortfeasor settles "the defendant has the burden of proof that the settling tortfeasor's tortious conduct was a legal cause of plaintiff's injury . . ., that there was a settlement, that the settlement was for the injuries for which the plaintiff is suing, and that defendant would otherwise have a valid contribution claim against the settling tortfeasor.").

Furthermore, defaulting defendants have no right to the benefit of the one-satisfaction rule because "[t]he law contains no rigid rule against overcompensation. Several doctrines, such as the collateral benefits rule, recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation." *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 219 (1994). As the Supreme Court noted, the law allows a person to recover full damages from a tortfeasor, "even when he has already been made whole by insurance or other compensatory payment." *Id.* at n. 30 (citing 4 F. Harper, F. James & O. Gray, Law of Torts 25.22 (2d ed. 1986)).

In addition, the defaulting Defendants in this case were not even entitled to bring valid contribution claims against other joint tortfeasors because the Anti-Terrorism Act does not permit such claims. *See Litle v. Arab Bank, PLC*, 611 F. Supp. 2d 233, 248-49 (E.D.N.Y. 2009) ("the court finds that Congress did not indicate . . . its intent to create a contribution claim on behalf of those accused of intentionally violating the ATA."). If Plaintiffs had not taken the

20

initiative to sue another jointly and severally liable tortfeasor, the Defendants would never have had any prospect of reducing their liability burden. Accordingly, defaulting defendants should not be entitled to reduce their liability merely by ignoring this Court's authority and waiting to see if plaintiffs will have better luck pursuing other defendants before judgment is entered. The right to assert the one-satisfaction rule is a right that defaulting defendants ignore at their peril.

## Conclusion

For all of the above reasons, Plaintiffs respectfully request that this Court enter default judgments against the Defendants and award Plaintiffs the damages they have requested plus trebling pursuant to 18 U.S.C. § 2333(a). Plaintiffs also request that the final judgment specify that because, as noted by the State Department, the FARC trafficked in drugs and maintained ties to narcotraffickers, Plaintiffs be deemed crime victim judgment creditors with perfected liens on proceeds derived from drug trafficking criminal activities. This will help Plaintiffs attempt to collect their judgments against any FARC related drug money or property that may be seized in the future. *See U.S. v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1191 (D.C. Cir. 1995) citing *U.S. v. Schwimmer*, 968 F.2d 1570, 1581 (2d Cir. 1992) and *U.S. v. Campos*, 859 F.2d 1233, 1240 (6th Cir. 1998) (a general creditor does not have standing to assert an interest in a debtor's forfeited property "unless they have already secured a judgment against the debtor and perfected a lien").

Date: April 25, 2018

Respectfully submitted,

*/s/ Nathaniel A. Tarnor*
(D.C. Bar No. 985457)
Hagens Berman Sobol Shapiro, LLP
555 Fifth Avenue, Suite 1700
New York, NY 10017
Telephone: (646) 543-4992
Email: NathanT@hbsslaw.com

21