# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| OLIVIA PESCATORE, *et al.*, | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 08-2245 (RMC) |
| JUVENAL OVIDIO RICARDO PALMERA PINEDA, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Frank Thomas Pescatore, Jr., was working as a geologist in the Republic of Colombia in 1996 when he was kidnapped, held for ransom, killed, and eviscerated in an effort to take "life like" photos to support ransom demands. The perpetrators were members of the Fuerzas Armadas Revolucionarias de Colombia (FARC), a group since found to be terrorists by the United States Department of State. In 2008, his family sued FARC and Juvenal Ovidio Ricardo Palmera Pineda, also known as Simon Trinidad, under the Antiterrorism Act. After this Court found Defendants liable for Mr. Pescatore's death, this case trailed a related case in Florida for years; that case has now settled.[1] Returning to the District of Columbia, Mr. Pescatore's family seeks $240 million in damages. Based on the evidence provided, the Court will grant their motion in part and award lesser sums.

## I. BACKGROUND

Defendants' liability in this case has already been established through default. *See* Order [Dkt. 17]. Therefore, the facts of this case will be recounted only briefly here.

---

[1] *See In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284 (S.D. Fla. 2018).

In December 1996, decedent Frank Pescatore was working as a geologist at the Cerrejon coal complex in La Guajira Department, Colombia. Compl. [Dkt. 1] ¶ 28. On or about December 19, 1996, members of FARC's Caribbean Bloc under the command and control of Defendant Palmera Pineda attacked the coal complex. While none of the Colombians at the site was injured, FARC captured Mr. Pescatore and took him into the Colombian jungle. *Id.* ¶ 29.

FARC then attempted to obtain a ransom for Mr. Pescatore. *Id.* ¶ 31. When, in February 1997, he attempted to escape, he was shot dead. *Id.* ¶ 32. To continue its ransom demands, FARC had his body eviscerated and makeup applied to have the body appear alive. *Id.* ¶¶ 32-34. Two months later, when Mr. Pescatore's ransom had not been paid, FARC dumped his body, which was then discovered on or about February 23, 1997. *Id.* ¶ 35.

Plaintiffs are members of the Pescatore family, including: Olivia Pescatore, Mr. Pescatore's surviving spouse; Josh Pescatore, Jada Pescatore, Jarrod Pescatore, and Jordan Pescatore, his children; the Estate of Frank Pescatore, Sr., his father; Carol Pescatore Harpster, his sister; and his brothers Richard and John Pescatore.

Defendants are FARC and Mr. Pineda, a senior FARC commander who was partially responsible for Mr. Pescatore's kidnapping and murder. *See* Second Decl. of Olivia Pescatore [Dkt. 40-8] ¶ 5; Letter from Christopher Carbonneau, Special Agent, Federal Bureau of Investigation, to Olivia Pescatore (Apr. 21, 2004) [Dkt.40-8]. According to the U.S. Department of State, as of September 1, 2017, FARC had agreed to a peace accord, disarmed, and reincorporated as a political party. *See* U.S. Dep't of State, Colombia 2017 Human Rights Report 14-15 (2017) available at https://www.state.gov/documents/organization/277563.pdf. Mr. Pineda is currently serving out a sixty-year prison term at the United States Penitentiary,

Administrative Maximum Facility in Florence, Colorado. *See* Mem. Op. [Dkt. 16] at 4. Neither Defendant has appeared before this Court.

## II. LEGAL STANDARD

A default judgment under Fed. R. Civ. P 55 establishes the defaulting party's liability for every well-pled allegation in the complaint. *Int'l Painters & Allied Trades Indus. Pension Fund v. Newburgh Glass and Glazing, LLC*, 468 F. Supp. 2d 215, 217 (D.D.C. 2007) (citing *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001)). However, it does not automatically establish liability in the amount claimed by the plaintiff. *Id.* Rather, "unless the amount of damages is certain, the court is required to make an independent determination of the sum to be awarded." *Adkins*, 180 F. Supp. 2d at 17 (citing *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 814 (2d Cir. 1975)). The court has considerable latitude in determining the amount of damages. *Fanning v. Wegco, Inc.*, 5 F. Supp. 3d 1, 4 (D.D.C. 2013) (citing *Jones v. Winnepesaukee Realty*, 990 F.2d 1, 4 (1st Cir. 1993)). The court may determine the appropriate sum by hearing, *see* Fed. R. Civ. P. 55(b)(2), but it may also rely on detailed affidavits or other documentary evidence. *Fanning*, 5 F. Supp. 3d at 6. Ultimately, what matters is that the court "ensures that there is a basis for the damages specified in the default judgment." *Id.* at 4.

## III. ANALYSIS

The family of Mr. Pescatore now seeks "damages from the Defendants solely for their emotional loses." Pls.' Mot. for Default J. Regarding Damages (Dmg. Mot.) [Dkt. 40] at 7. Plaintiffs suggest their own figures for damages: Olivia Pescatore seeks $15 million in damages for her loss. *Cf. Estate of Bayani v. Islamic Republic of Iran*, 530 F. Supp. 2d 40, 46 (D.D.C. 2007) (awarding $30 million to widow of American held captive for 2 years before his brutal murder). She argues that a large award is justified because "larger awards are typically reserved for cases with aggravating circumstances that appreciably worsen the surviving spouse's pain

3

and suffering, such as cases involving torture or kidnapping," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006), and notes that here FARC not only kidnapped and killed her husband but also eviscerated his body in order to prolong ransom negotiations with his family.

Each of Mr. Pescatore's children seeks $10 million for their loss. *Cf. Higgins v. Islamic Republic of Iran*, No. 1:00-CV-00377, 2000 WL 33674311 at *8 (D.D.C. Sept. 21, 2000) (awarding $12 million to the daughter of a U.S. Marine held captive and executed by Hezbollah). They also argue that "it follows that this amount should also be awarded to his father because parents and children are generally awarded the same amounts." Dmg. Mot. at 10-11 (citing *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 24, 51 (D.D.C. 2007)). "Finally, an award of $5 million to Mr. Pescatore's siblings is warranted because the siblings of a terrorist attack victim generally receive half the amount awarded to parents and children." *Id.*

In addition, Plaintiffs ask that their awards be trebled pursuant to 18 U.S.C. § 2333(a) ("Any national of the United States injured in his or her person . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.").

### A. Documentation of Loss

In support of the numbers they put forward, each Plaintiff submitted both personal declarations and an expert report from Dr. Rael Strous, a board-certified psychiatrist and professor.[2] Dr. Strous is a medical doctor who specializes in psychiatry and is employed as the

---

[2] These materials are quoted extensively in this Memorandum Opinion. Although this Court would normally redact such statements, Plaintiffs have already filed these materials in their entirety on the public docket. *See generally* Dmg. Mot.

Deputy Hospital Director and Director of the Ambulatory Service of the Be'er Yaakov Mental Health Center located in Be'er Yaakov, Israel. *See* Expert Report of Dr. Rael Strous Re: Olivia Pescatore (Olivia P. Report) [Dkt. 40-18] ¶ 1. He also serves as a Full Professor in the Department of Psychiatry at the Sackler Faculty of Medicine at the Tel Aviv University and maintains a small private practice. *Id.* Dr. Strous has repeatedly been accepted as an expert in this District and others in the United States, as well as in Israel. *Id.* ¶ 5.

Dr. Strous' evaluations of the Pescatore family members were "based on clinical interview[s] and formal psychiatric evaluation[s], as well as [his] review of the relevant affidavit and deposition materials in this case." *See, e.g.*, *id.* at 1. Because Dr. Strous concluded that each Plaintiff suffers from essentially identical conditions, it is helpful to describe those conditions first.

Dr. Strous identified Persistent Complex Bereavement Disorder as a "description of the normal mourning process that leads to chronic or ongoing mourning" experienced by "people who are unable to get over their grief despite the passage of time." *Id.* ¶ 9. Post-Traumatic Stress Disorder (PTSD) is a "condition which develops from having been exposed to, or witnessing, life-threatening events" and may also be experienced indirectly "by hearing of a relative or close friend . . . [whose] death must [have been] accidental or violent." *Id.* ¶ 10. Symptoms of PTSD "include avoidance, re-experiencing the event, and hyper-vigilance, . . . [which is] a cluster of symptoms that includes exaggerated startle response, inability to fall asleep and inability to stay asleep." *Id.* Among other issues, PTSD can lead to "memory problems and a distorted sense of blame." *Id.* ¶ 11. As a result, "educational and employment prospects for PTSD victims are often lowered." *Id.* ¶ 12. Finally, Dr. Strous described Persistent Depressive Disorder, or Dysthymic Disorder, as a "chronic (long-lasting), mild form of

depression" that "can last for years and . . . can be just as debilitating as a more acute episode of major depression (clinical depression), even leading to thoughts of, or attempts at, suicide." *Id.* ¶ 15.

Based on these submissions and with regards to each of the Plaintiffs, the Court notes the following facts:

*1. Olivia Pescatore*

Olivia Pescatore "nearly had a complete nervous breakdown" both in 1996, when she learned that Mr. Pescatore had been kidnapped, and again in 2005 when she learned that he had been eviscerated by FARC to prolong hostage negotiations. First Decl. of Olivia Pescatore [Dkt. 40-3] ¶ 25. Indeed, during and immediately after his kidnapping, Mrs. Pescatore's mother had to stay with the family for seven months because Mrs. Pescatore "could barely get out of bed and could no longer care for [her] children." *Id*. ¶ 20. As of 2016 she still found the subject difficult to talk about, and continued to suffer from high blood pressure, depression, panic attacks, and anxiety, all related to her husband's death. Olivia P. Report at 2, 6.

In 2016, Dr. Strous determined that "Olivia Pescatore displays some form of Persistent Complex Bereavement Disorder, Post-traumatic Stress Disorder and Persistent Depressive Disorder either currently or in the past as a result of her husband being kidnapped and later killed" and "many of her symptoms may even be permanent." *Id.* ¶¶ 16-17. This determination was based in part on Mrs. Pescatore's longstanding grief and anxiety related to her husband's death. *See id*. at 3-4.

*2. Josh Pescatore*

Josh Pescatore is the oldest son of Mr. Pescatore and states that Mr. Pescatore "was an ever present figure in my life who I respected and tried to honor." Decl. of Josh Pescatore (Josh P. Decl.) [Dkt. 40-20] ¶ 3. Josh was a senior in high school when his father was

kidnapped, *see id.* ¶ 7, and he states that "[o]vernight I went from an above average student to a nervous wreck." *Id.*; *see also* Expert Report of Dr. Rael Strous Re: Joshua Pescatore (Josh P. Report) [Dkt 40-19] at 10-11 ("[Mrs. Pescatore] quotes that he scored a thirty-five on the ACT test when he was a freshman."). Josh dropped out of high school after his father's death and never attended college. *Id.* at 10-11. Instead, he resorted to heavy alcohol and drug use to manage his emotions. *See* Josh P. Decl. ¶ 9. Josh "admits to a serious opiate addiction for the past 19 years or so. He has been in a drug rehabilitation program four times and has also been in prison as a direct result of his drug use. He adds that he has wasted 'tens of thousands' of dollars on his substance abuse." Josh P. Report at 4. Josh stated in 2015 that "[i]t's easy to look back as a 33 year old man and see what mistakes and wrong choices I made but for an 18 year old who just had the most traumatic experience of his life . . . there was no help for me. . . . It was the worst part of my life. It changed me for the worse forever and I know that." Josh P. Decl. ¶ 9.

Dr. Strous diagnosed Josh as displaying "some form of Persistent Complex Bereavement Disorder, Post-Traumatic Stress Disorder, Substance Use Disorder and Substance Induced Depressive Disorder either currently or in the past." Josh P. Report ¶ 17. Dr. Strous explained:

> Substance abuse is common among people who suffer from a depressive disorder. Many substances trigger depression systems like lethargy, sadness and hopelessness. In addition, many depressed individuals reach for drugs or alcohol as a way to raise their spirits or to numb painful thoughts and anxieties. As a result, depression and substance abuse are often related, and one condition will often make the other worse.

*Id.* ¶ 16. Dr. Strous also determined that many of Josh's symptoms "are likely to be present in varying degrees for a significant time to come and . . . many of the symptoms may even be permanent." *Id.* ¶ 18.

7

3. *Jada Pescatore*

Jada Pescatore is Mr. Pescatore's second child and oldest daughter.  *See* Expert Report of Dr. Rael Strous Re: Jada Pescatore (Jada P. Report) [Dkt. 40-21] at 2.  Jada states that she had "the closest relationship [with her father] out of everyone else in the family," and, when she found out he had been kidnapped during her sophomore year in high school, she "felt like someone had reached into [her] chest and ripped [her] heart out."  Decl. of Jada Pescatore (Jada P. Decl.) [Dkt 40-7] ¶¶ 1-2; *see also* Jada P. Report at 2.  Afterwards, she states that "the anger in me grew and grew" and that she still has nightmares.  Jada P. Decl. ¶¶ 6, 13.  In 2016, she reported to Dr. Strous that "she feels that all her relationships, even positive ones over time came to be affected by the loss of her father."  Jada P. Report at 4.  In 2011, Jada was reported "in good health."  Pls.' Resp. to Mar. 31, 2011 Order to Provide the Age and Health Status of Each Pl. (Pls.' Health Update) at 3.  Notwithstanding, in 2016 Dr. Strous determined that Jada "displays some form of Persistent Complex Bereavement Disorder and Post-traumatic Stress Disorder either currently or in the past" and believes that "many of the symptoms may even be permanent."  Jada P. Report ¶¶ 15-16.

4. *Jarrod Pescatore*

Jarrod Pescatore was eleven-and-a-half years old when he learned of the kidnapping and murder of his father.  *See* Decl. of Jarrod Pescatore [Dkt. 40-23] ¶ 1.  The details are vague in his mind, "mostly because [he] doe[s] not like to remember that time."  *Id.* ¶ 4.  Frank Pescatore was a superhero to Jarrod and his death made him angry.  *See id.* ¶ 2.  He remembers "crippling heartache as I watched my friends converse with their fathers."  *Id.* ¶ 8.  Jarrod also stated that "[m]ost of all, I hate the toll it has taken on my mother."  *Id.* ¶ 10.  In his session with Dr. Strous, Jarrod reported that "he knows that his personality has been irreversibly and profoundly affected by the loss of his father . . . in such a sudden and traumatic manner."

8

Expert Report by Dr. Rael Strous Re: Jarrod Pescatore (Jarrod P. Report) [Dkt. 40-22] at 5.  In 2011, at age 25, Jarrod was reported to the Court as "in good health."  Pls.' Health Update at 4.  According to Dr. Strous, Jarrod "displays some form of Persistent Complex Bereavement Disorder, Post-traumatic Stress Disorder and Persistent Depressive Disorder either currently or in the past" and "many of the symptoms may even be permanent."  Jarrod P. Report ¶¶ 16-17.

5. *Jordan Pescatore*

Jordan Pescatore was "a 10 year old little girl" when her father was kidnapped, and reported that "[n]othing has been the same since that day" when she heard he was dead.  Decl. of Jordan Pescatore [Dkt 40-9] ¶¶ 1-2.  She states that she has been through "mental struggles, addictions, pain, loneliness, and grief.  And it will never end."  *Id.* ¶ 6.  In her session with Dr. Strous, Jordan reported that even though she has a degree in social work, she "found it hard in general to help others when she was still dealing with her own demons" and that "even though she enjoyed social work, she found it too overwhelming and painful with memories of her own issues returning."  Expert Report of Dr. Rael Strous Re: Jordan Pescatore [Dkt. 40-24] at 5.  She has struggled with low self-esteem and "experiences much guilt over not being there for her family due to her problems confronting the loss."  *Id*.  She further reported that "she feels that her grieving shaped her personality to what it is today."  *Id.*  Dr. Strous determined that Jordan "displays some form of Persistent Complex Bereavement Disorder, Post-traumatic Stress Disorder and Persistent Depressive Disorder either currently or in the past" and "many of the symptoms may even be permanent."  *Id.* ¶¶ 16-17.

6. *Frank T. Pescatore, Sr.*

Frank Pescatore, Sr., died on March 4, 2016, at the age of 89 and twenty years after his oldest son was killed by FARC.  His estate is represented by his daughter, Carol

9

Harpster.[3] Dr. Strous interviewed Frank Sr.'s sons Richard and John, his daughter, Carol, and his son-in-law, Greg Sparrow, and, from those sources, prepared a psychiatric evaluation of Frank Sr. *See* Fed. R. Evid. 803(3) (permitting hearsay testimony regarding the declarant's then-existing emotional and physical conditions). Dr. Strous states that the family's descriptions of Frank Sr.'s intense grief suggest that he suffered from Persistent Complex Bereavement Disorder and Persistent Depressive Disorder, which may have been a Major Depressive Disorder for the last years of his life. Expert Report of Dr. Rael Strous Re: Frank Pescatore Sr [Dkt 40-12] at 6. He also notes "the prevalence of complicated grief after violent death is much higher than after other forms of death such as illness." *Id*.

7. *Carol Pescatore Harpster*

Carol Pescatore Harpster, Mr. Pescatore's older sister, says that "[l]osing a sibling to murder causes an indescribable pain that never completely goes away" and that "Frank's murder tore a hole in the fabric of our family." First Decl. of Carol Pescatore Harpster [Dkt. 40-1] ¶ 3. Carol was reported "in good health" in 2011, when she was in her mid-fifties. Pls.' Health Update at 4. Dr. Strous reports that Carol "displays some form of Persistent Complex Bereavement Disorder and Post-traumatic Stress Disorder either currently or in the past" and "many of the symptoms may even be permanent." Expert Report of Dr. Rael Strous Re: Carol Pescatore Harpster [Dkt. 40-13] ¶¶ 15-16.

---

[3] *See* Mot. for Substitution on Behalf of the Estate of Frank Pescatore, Sr. [Dkt. 32] ¶ 5. Carolyn Pescatore, Frank Sr.'s widow, was authorized to act as the representative of his estate, and was substituted for Frank Sr. *See* Minute Order 2/03/17. Carolyn Pescatore is not a plaintiff on her own behalf. *See* Compl. Carol, Frank Sr.'s daughter, was appointed executrix of his estate. *See* Second Decl. of Carol Pescatore Harpster [Dkt 40-2] ¶ 14. The death of Frank Sr. does not extinguish his claims. *See* 18 U.S.C. § 2333(a).

8. *Richard Pescatore*

Richard Pescatore "loved [his] brother more than anything in the world. We were extremely close . . . and only a year and a half apart." Decl. of Richard Pescatore [Dkt. 40-15] ¶ 2. Richard was the one who told his parents that Frank was dead, which "was one of the hardest things I ever did in my life. My father made a sound I had never heard before and never want to hear again." *Id*. ¶ 4. Richard states that the "hardest thing of all is living with my failure to get Frank home" after he was kidnapped. *Id.* ¶ 12. In 2011, Richard, in his early fifties, was reported to be "in good health." Pls.' Health Update at 4. Dr. Strous opined in 2016 that Richard Pescatore "displays some form of Persistent Complex Bereavement Disorder, Post-traumatic Stress Disorder and Persistent Depressive Disorder either currently or in the past" and "many of the symptoms may even be permanent." Expert Report of Dr. Rael Strous Re: Richard Pescatore [Dkt. 40-14] ¶¶ 16-17.

9. *John Pescatore*

John Pescatore was born eight years after his oldest brother, Mr. Pescatore. *See* Decl. of John Pescatore [Dkt 40-17] ¶ 1. John received a letter from Mr. Pescatore in 1996 which he keeps framed and hanging in his office to this day. *See id.* ¶ 4. He stated further that "[t]his letter to me is like having all the gold in the world." *Id.* As with his siblings, John, in his mid-forties, was reported to be "in good health" in 2011. Pls.' Health Update at 4. Dr. Strous determined in 2016 that "John Pescatore displays some form of Persistent Complex Bereavement Disorder and Post-traumatic Stress Disorder either currently or in the past" and "many of the symptoms may even be permanent." Expert Report of Dr. Rael Strous Re: John Pescatore [Dkt. 40-16] ¶¶ 16-17.

## B. Solatium Damages

Although Plaintiffs allude at various times to financial difficulties, they do not provide the Court with any "hard data" to, for instance, calculate the financial losses to the immediate family caused by Mr. Pescatore's missing income; he was, after all, only 41when he was killed. No Plaintiff has submitted reports or bills from attending psychiatrists or psychologists, to whom they might have turned for help in the aftermath of Mr. Pescatore's death. No Plaintiff has described any struggle with paying for college or other education. Indeed, the Court earlier expressed concern about the lack of support for Plaintiffs' damages. *See* Mem. Op. at 13 (granting default judgment on liability but finding that "[b]ased upon the evidence submitted, the requested amounts for damages are not adequately established").

Instead, Plaintiffs seek compensation only for their "mental anguish, bereavement and grief resulting from the fact of decedent's death." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998). The legal term for such compensation is "solatium," which is defined as "[c]ompensation; esp. damages for hurt feelings or grief, as distinguished from damages for physical injury." Black's Law Dictionary 1426 (10th ed. 2014). *Flatow*, the first case decided against the Islamic Republic of Iran under the Foreign Sovereign Immunities Act, identified a series of factors to consider when awarding solatium dangers. *See Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356-57 (D.C. Cir. 2018) (remanding for consideration of *Flatow* factors). Inasmuch as its analysis undergirds an award for the loss by family members of a decedent's society and their anguish, the Court will apply *Flatow* here. *See Flatow*, 999 F. Supp. at 30-32. Other district courts have described those factors as including:

> (1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e., the closeness) of the relationship between the claimant

12

and the decedent; and (5) the duration of the claimants' mental anguish in excess of that which would have been experienced following the decedent's natural death.

*Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89-90 (D.D.C. 2002) (citing *Flatow*, 999 F. Supp. at 30-31).

In this case, factor one applies in three separate ways for all Plaintiffs: first, there was the sudden and unexpected nature of Mr. Pescatore's kidnapping, which caused great anxiety for two months; then there was the notice that he had been killed; and, some years later, the notice that he had been eviscerated and made to appear alive in photos after his death. These events were unexpected and had an immense effect on each member of Mr. Pescatore's family. Twice, Olivia was unable to care for her family for months after her husband's kidnapping and almost had nervous breakdowns; Josh dropped out of high school and turned to drugs; Jada felt as if "someone had reached into my chest and ripped my heart out"; Jarrod felt "cripple[d]" when he saw friends with their fathers; Jordan experienced "mental struggles, addictions, pain, loneliness and grief"; Frank Sr. collapsed emotionally and never regained full health; Carol experienced "an indescribable pain that never completely goes away"; Richard felt guilt for not having done more to help Frank; and John felt the immediate and long-term loss of a beloved older brother.

As to factor two, Mr. Pescatore's kidnapping and murder was clearly the result of intentional malice, not negligence. Indeed, as the only non-Colombian in his group, he was the only one taken so that his captors could extort a ransom.

Facts related to the third factor, medical treatment, are not well substantiated in the record. The Court has only hints that one or more of the family members sought treatment for depression or other disorders.

In a factor that is difficult upon examination, *Flatow* suggests that the "closeness" of plaintiff to the decedent should contribute to an award for solatium damages. *Flatow*, 999 F. Supp. at 31-32. The parties' declarations show that Olivia and Frank Sr. were very close to Mr. Pescatore and that all of Mr. Pescatore's children felt an immense and wrenching loss at his death. While his siblings were also deeply affected by Mr. Pescatore's death, they were all adults and lived separate lives.

The last *Flatow* factor seeks to identify the duration of each person's excessive grief and to compensate for that. Again, Olivia and Frank Sr. clearly suffered until at least 2016. Josh turned away from the family and to alcohol and drugs for his pain and guilt, recovered, relapsed in 2011, and has basically had a serious drug addiction since his father's death. His status after 2016 is not known. Jada, Jarrod, Jordan, Richard, and John Pescatore and Carol Harpster all were reported to be in good health in 2011. This statement is not meant to suggest that their grief had ended or that they no longer thought about or missed Frank Pescatore; that result may never come. On a comparative scale, however, their grief seems to have materially abated over the years.[4]

---

[4] The Court acknowledges, but does not find especially informative, Dr. Strous' expert findings. Having sat with each Plaintiff for one day some 20 years after the underlying events, Dr. Strous reaches essentially the same clinical diagnosis for each Plaintiff: Persistent Complex Bereavement Disorder (moderate); PTSD (partial); and sometimes Persistent Depressive Disorder (moderate). Different Plaintiffs report suffering from a wide range of effects over various durations and yet have the same diagnoses. Dr. Strous formulaically repeats that each Plaintiff displays "some form" of these conditions "either currently or in the past" and that these conditions "may even be permanent," even though *when* and *for how long* each Plaintiff was affected weighs on the Court's judgment; indeed, Dr. Strous does not explain how a condition present only in the past, but not currently, could be permanent. The Court appreciates the expertise Dr. Strous brings to his psychiatric evaluations and the passage of time with which he was dealing but, as indicated, relies more on Plaintiffs' (very helpful) statements to him, the health update they provided in 2011 (*i.e.*, Pls.' Health Update), and their declarations here.

In addition to consideration of the factors identified in *Flatow*, "[c]ompensatory damages awards to family members of the victim of a terrorist attack are generally determined by the nature of the relationship. Spouses typically receive greater damage awards than parents, who, in turn, receive greater awards than siblings." *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 161 (D.D.C. 2006). "Parents of victims typically receive awards similar in amount to those awarded to children of the victim." *Peterson*, 515 F. Supp. 2d at 51 (D.D.C. 2007). "[F]amilies of hostage or captivity victims are also typically awarded greater damages than are the families of victims of a single attack . . . [and] families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006).

In cases brought under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605A, many district courts have followed the solatium damages model established in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006). *See Fraenkel*, 892 F.3d at 361. This Court has not. *Heiser*'s framework is not a mandatory scheme and district courts have "wide discretion . . . to determine the damages that are due under the FSIA." *Id.* at 361-62. To the extent that this Court assesses damages under the Antiterrorism Act (ATA), 18 U.S.C. § 2333 *et seq.*, in a manner similar to how it assesses damages under the FSIA, this Court continues to exercise its judgment and discretion based on the facts before it.

Accordingly, the Court awards the following amounts in compensation for the loss suffered by each member of Mr. Pescatore's family:

    Olivia Pescatore (widow): $5,000,000

    Josh Pescatore (son): $3,000,000

    Jada Pescatore (daughter): $3,000,000

        Jarrod Pescatore (son): $3,000,000

        Jordan Pescatore (daughter): $3,000,000

        Frank T. Pescatore, Sr. (father): $3,000,000

        Carol Pescatore Harpster (sister): $1,000,000

        Richard Pescatore (brother): $1,000,000

        John Pescatore (brother): $1,000,000

These damages shall be trebled. *See* 18 U.S.C. § 2333(a). This Court has previously awarded solatium damages in two FSIA cases: *Fraenkel v. Islamic Republic of Iran*, 316 F. Supp. 3d 284 (D.D.C. 2018), and *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008). Without directly comparing these cases—the award of solatium being so fact specific—the Court merely notes that the above amounts (less trebling) are consistent with amounts previously awarded.[5]

---

[5] Plaintiffs also ask the Court to deem them "crime victim judgment creditors with perfected liens on proceeds derived from drug trafficking criminal activities." Dmg. Mot. at 21 (citing *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1191 (D.C. Cir. 1995)). The Court declines to do so here. Plaintiffs cite no sources explaining the Court's authority to make such a determination. *Cf. BCCI Holdings*, 46 F.3d at 1192 (finding that general creditors "can never have an interest in specific forfeited property" because that result "appears patently at odds with the statutory scheme, which directs parties without an interest in specific property to seek relief from the Attorney General, not the court adjudging the forfeiture."). Although Plaintiffs' motions are unopposed, "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

## IV. CONCLUSION

FARC as it existed in 1996 is gone; Mr. Pineda will be imprisoned for other murders for decades to come; there is no one left to punish. Whether any monetary award so long after the terrorizing events can otherwise bring further solace, the law attempts to perform that function. A memorializing Order accompanies this Memorandum Opinion.


Date: November 1, 2018

                                                  ROSEMARY M. COLLYER
                                                 United States District Judge